**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| MAINE ASSOCIATION OF RETIREES, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Docket no. 1:12-cv-59-GZS |
| BOARD OF TRUSTEES OF THE MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM, et al., | ) |
| Defendants. | ) |

**ORDER ON MOTION TO DISMISS & FOR SUMMARY JUDGMENT**

Before the Court is Defendants' Motion to Dismiss and for Summary Judgment (ECF No. 58). After the Motion was fully briefed, the Court held oral argument on May 14, 2013. Having considered all of the parties' written and oral submissions, the Court now GRANTS the Motion for reasons explained herein.

## I. LEGAL STANDARD[1]

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."

[1] At the outset, the Court notes its decision to treat Defendants' Motion as a motion for summary judgment in light of the voluminous materials submitted by both sides in connection with the briefing on the pending motion and the Court's consideration of those materials. See Fed. R. Civ. P 12(d). The Court recognizes that much of the material submitted is legislative history, which might be considered a matter of judicial notice and/or legal research. Nonetheless, as a matter of judicial efficiency and in an exercise of its discretion, the Court has considered the entire record without attempting to limits its consideration to the smaller subset of materials that may be considered on a motion to dismiss. See, e.g., Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 320-21 (1st Cir. 2008).

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida–Gonzalez v. Tirado–Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera–Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II. LEGISLATIVE BACKGROUND

At the center of the pending dispute is the Maine Public Employees Retirement System ("MePERS"), a program established under Maine law for the purpose of providing retirement benefits for state employees and public school teachers, among others. 5 M.R.S.A. § 17101. State employees and public school teachers are "members" of MePERS during their public employment, and required to make mandatory contributions into a pension fund. Id. §§ 17651, 17701 *et seq*. Membership in MePERS ends when a member leaves employment and withdraws his accumulated contributions, or when he "retires" and becomes a "beneficiary" entitled to receive retirement benefits. Id. §17654; see also id. §17001(33) (defining "retirement" as "termination of membership with a retirement allowance granted under this chapter"). Generally, benefits due a retiree are calculated in reference to the retiree's annual compensation as of the date of the retiree's retirement. Id. § 17851.

The dispute in this case focuses on the amount of benefits due to MePERS' beneficiaries presently and in the future as a result of cost of living adjustments that are calculated by the MePERS Board of Trustees pursuant to 5 M.R.S.A. § 17806. However, to provide the necessary context for the current dispute, the Court first summarizes MePERS' lengthy legislative history.

The legislative roots of MePERS, formerly known as the Maine State Retirement System, date back to 1913 when the Maine Legislature passed *An Act to Increase the Efficiency of the Public Schools of Maine by Retiring Teachers of Long Service with Pensions*, P.L. 1913, ch. 75 (ECF No. 76-1),[2] and thereby provided for pensions in set amounts to retiring teachers based on the teacher's age and years of service. This initial pension system required no contribution from

[2] All "P.L." citations in this Order refer to Maine Session Laws in accordance with Uniform Maine Citations (2012). To the extent the item also appears on the docket, the Court's citation includes reference to the ECF & Page ID# numbers generated by CM/ECF.

the salaries earned by individual teachers. In 1923, the Maine Legislature created the Maine Teachers' Retirement System and provided that teachers then in-service elect between joining this newly created system and the prior pension system. See P.L. 1923, ch. 209, § 22 (ECF No. 65-1 at PageID# 500). Upon joining the Maine Teachers' Retirement System, teachers became "members" of the "Maine teachers' retirement association" and contributed portions of their salary, which were matched by the state. Id. at § 3. Any changes to the Maine Teachers' Retirement System required approval of the membership pursuant to statutory mandate. Id. at § 21.

Maine had a separate pension system for other state employees until approximately 1942. See P.L. 1933, ch. 1, §§ 227-233 (ECF No. 65-1 at PageID#s 503-04). In the 1940s, the Maine Legislature proposed a statewide retirement system for state employees that would be jointly funded by contributions from the state and the employee's salary. See Report on a Proposed Retirement System for State Employees of Maine, dated January 22, 1941 (ECF Nos. 65-1 & 65-2 at Page ID#s 505-532). In recommending this move, the Recess Committee on State Contributory Pension System explained:

> Retirement allowances should not be gratuities. … The primary reason for the State operating a retirement system is to benefit the taxpayers.
> …
> Under a jointly contributory retirement system a young employee entering service is compelled to be thrifty, because he is forced to save part of his compensation during active service. Consequently, when he reaches old age he can be retired from service, and his own savings plus a reasonable allowance from the employer provide an adequate retirement income.

Id. at Page ID#s 510-11. In 1942, the Maine Legislature accepted the Recess Committee's recommendations and established the Employees' Retirement System for the State of Maine, which was to be administered by a board of trustees. See P.L. 1942, ch. 328 (ECF Nos. 65-2 – 65-4 at Page ID#s 533-554). In adopting this joint contribution system for future retirees, the

Maine Legislature explicitly indicated that the pension benefits payable to retirees prior to the establishment of this new retirement system would "be continued and paid." Id. at § 227-N (Page ID# 550).

By 1947, Maine merged its state employees' retirement system with its retirement system for teachers. See P.L. 1947, ch. 384 (ECF Nos. 65-4 – 65-6 at Page ID#s 557-583). As it had in enacting the 1942 legislative changes, the 1947 enactments explicitly stated that benefits already being paid to current retirees would "be continued and paid." Id. at § 15-A (Page ID# 578). In 1955, the Maine Legislature again revised the retirement system and renamed it the "Maine State Retirement System." P.L. 1955, ch. 417 (ECF No. 65-6 – 65-7 at Page ID #s 588-610).

In 1965, Maine first adopted legislation that provided cost-of-living adjustments to beneficiaries of the state retirement system. P.L. 1965, ch. 337 (ECF No. 76-2 at Page ID#s 708-710), codified at 5 M.R.S.A § 1128. Then, in the early 1970s, the Maine Legislature once again undertook a comprehensive review of the Maine State Retirement System. The resulting final report was published in January 1975. See Final Report of the Committee on Veterans and Retirement on its Study of the Maine State Retirement System (excerpt provided at ECF Nos. 65-7 at Page ID#s 611-615). In proposing additional changes to the statutes governing the retirement system, this Committee explained that "[a]mendments that remove or modify benefits have been limited in retroactivity in order to insure the continuation of presently vested rights." Id. at Page ID# 612. A later section of the same report describes the addition of "a subsection to protect the accrued benefits of members from retroactive reduction." Id. at Page ID# 613-614. As ultimately passed by the Maine Legislature, these 1975 amendments included the following subsection related to the review of future proposed amendments:

> Effect on accrued benefits. No amendment to this chapter shall cause any reduction in the amount of benefits which would be due to the member based on creditable

> service, compensation, employee contributions and the provisions of this chapter on the date immediately preceding the effective date of such amendment.

P.L. 1975, ch. 622, § 6, codified at 5 M.R.S.A. § 1005(3).

In 1977, the Maine Legislature adopted changes to the method for calculating cost-of-living adjustments thereby providing that, after an initial waiting period of six months, all retirees were entitled to annual, compounding increases in their retirement allowance of up to four percent. See P.L. 1977, ch. 573 (ECF No. 58-5 at Page ID# 350), codified at 5 M.R.S.A. § 1128.

In 1985, the laws governing the Maine Retirement System were again revised and reallocated. See P.L. 1985, ch. 801 (ECF No. 58-8). The original 1975 language limiting reduction to accrued benefits was revised and codified at section 17801 as follows:

> Amendment not to cause reduction in benefits
>
> No amendment to this Part may cause any reduction in the amount of benefits which would be due to a member based on creditable service, compensation, employee contributions and the provisions of this Part on the date immediately preceding the effectiveness of the amendment.

Id. as codified at 5 M.R.S.A. § 17801 (hereinafter, as referred to by the parties' papers, "Former Section 17801"). The 1985 legislative changes included a provision for a cost-of-living adjustment to be codified at section 17806, although the method and limits for calculating the cost-of-living adjustment were not substantively altered. See id. as codified at 5 M.R.S.A. § 17806. Additionally, the 1985 amendments added a new section titled, Law governing benefit determination, which read:

> 1. Termination on or after January 1, 1976. If member's final termination of service occurred on or after January 1, 1976, the retirement system law in effect on the date of termination shall govern the member's service retirement benefit.
> 2. Termination before January 1, 1976. If a member's final termination of service occurred before January 1, 1976, the retirement system law in effect on January 1, 1976 shall govern the member's service retirement benefits.

Id. as then codified at 5 M.R.S.A. § 17853. In 1987, the Legislature made a small additional amendment to Former Section 17801 adding "pick-up contributions" and "earnable" compensation to the explicit list of the basis for "benefits which would be due to a member." See P.L. 1987, c. 739, § 25.[3]

The early 1990s brought concerns about the funding of the Maine State Retirement System. These concerns resulted in not only legislative changes but also changes to Maine Constitution. See Maine Const. Art. 9, Secs. 18-18-B. The goal of these changes was to ensure the system was properly funded and financially sound. See, e.g., 5 M.R.S.A. § 17151.

As is discussed later in this Order, Maine's retirement system law was also the subject of litigation in this Court and the First Circuit in the 1990s. See Parker v. Wakelin, 937 F. Supp. 46 (D. Me. 1996), *aff'd in part & rev'd in part*, 123 F.3d 1 (1st Cir. 1997), *cert. denied* 523 U.S. 1106 (1998). Following this litigation, the Maine Legislature again revised the law governing the Maine State Retirement System in 1999. P.L. 1999, ch. 489. As part of these amendments, Former Section 17801 was "repealed and replaced." 5 M.R.S.A. § 17801 Historical & Statutory Notes. Thus, since 1999, Section 17801 has read, in relevant part, as follows:

> § 17801. Commitment to members and limitations
>
> **1. Commitment as to certain provisions and limitations.** The following provisions govern the commitment as to certain provisions and limitations.
> **A.** The commitment set out in paragraph B is effective October 1, 1999, for members who, on October 1, 1999 or thereafter, meet the creditable service requirement for eligibility to receive a service retirement benefit, at the applicable age if so required, under section 17851 or section 17851-A, subsection 2.

[3] This amendment was contingent on the Internal Revenue Service approving the employer pick-up plan of the Maine State Retirement System, which was approved on July 5, 1988. 5 M.R.S.A. § 17001 Historical Notes. "Pick-up contributions" apparently refers to contributions that are made by an employer but are designated as contributions of employees. Notably, "earnable compensation" is defined to include "pick-up contributions" in 5 M.R.S.A. § 17001(13)(A)(4).

> **B.** The protections established under the provisions listed in subparagraph (1) constitute solemn contractual commitments of the State protected under the contract clauses of the Constitution of Maine, Article I, Section 11 and the United States Constitution, Article I, Section 10, under the terms and conditions set out in subparagraph (2).
>
> **(1)** The commitment provided by this section applies to the protections established under the specific following provisions:
>
> **(a)** Section 17001, subsection 4; and subsection 13, paragraph B, subparagraph (1) and paragraph C, subparagraph (2);
>
> **(b)** Section 17806, subsection 4;
>
> **(c)** The subsection of section 17851, that is applicable to each member;
>
> **(d)** The paragraph of subsection 2 of section 17851-A, that is applicable to each member;
>
> **(e)** The paragraph of subsection 4 of section 17851-A, that is applicable to each member; and
>
> **(f)** The subsection of section 17852, that is applicable to each member.
>
> **(2)** The commitment established in this paragraph attaches to a given provision of those specified in subparagraph (1) when the member in question has met the creditable service requirement set out in the given provision, on the basis of which the protection established by the provision becomes effective.
>
> **2. Provisions not covered by subsection 1.** Subsection 1 does not apply to any provision of this Part not specifically identified in subsection 1. Any provision not specifically identified in subsection 1 may be increased, decreased, otherwise changed or eliminated by the Legislature as to any member regardless of whether the member has or has not met any creditable service requirement for eligibility to receive a service retirement benefit.

P.L. 1999, ch. 489, § 3 as codified at 5 M.R.S.A. § 17801. In a separate subsection, the statute goes on to explain that the limitations of subsection 1 apply to members who have met the creditable service requirements and that "the Legislature may increase, decrease, otherwise change or eliminate any provisions of this Part" with respect to members who have not met the applicable creditable service requirements.[4] See 5 M.R.S.A. § 17801(4). These revisions were the subject of amendment and debate within the House, as detailed in the Legislative Record, before being passed by the Maine House of Representative with 145 members voting in favor of

[4] 5 M.R.S.A. §§ 17851 & 17851-A provide for a variety of different levels of creditable service depending on a member's employment dates and position with the state government.

the amendment to Section 17801. See Legis. Record (House) May 24, 1999, 1300-1301 (excerpt at ECF No. 78-1 at Page ID#s 718-20).[5]

A summary from the Committee proposing the 1999 amendment of section 17801 explained:

> The amendment is intended to specifically supplant the holding of the United States Court of Appeals in Parker v. Wakelin et al., 123 F.3d 1 (1997) with respect to the retirement benefits listed in the amendment from the time those benefits attach as provided in the amendment. Parker held that Maine State Retirement law creates no enforceable private contractual right preventing the modification of members' retirement benefits until those benefits are actually receivable. The amendment establishes the listed benefits as solemn contractual commitments of the State protected under the contract clauses of the Constitution of Maine and the United States Constitution once the right to those benefits attaches.

Labor Committee Amendment A to L.D. 267 (May 20, 1999) (ECF No. 78 at PageID #s 715-16). After listing the five specific retirement benefits to be protected as "solemn contractual commitments," the Summary goes on to explain: "Any benefit or related provision not listed in the amendment can be changed or eliminated by the Legislature and the Legislature may change any provision of the retirement law for employees not having the minimum amount of creditable service for eligibility and protection." Id.

A decade later, in 2009 and 2010, the Maine Legislature passed amendments to section 17806 in order to clarify the action to be taken by the MePERS Board of Trustees in connection with cost-of-living adjustments when there was any percentage decrease in the Consumer Price Index. See 2009 Me. Legis. Serv. Ch. 433 (West) & 2010 Me. Legis. Serv. Ch. 473 (West). In passing the first of these two amendments, the Legislature indicated that passing the legislation on an emergency basis was required "so that the benefits for state retirees are protected." 2009

[5] As noted by Plaintiffs, the floor debate that preceded this vote included statements by multiple representatives. See Pls. Response (ECF No. 63) at 17. While the Court has considered all of these statements, the Court has concluded that the statement of individual representatives alone provide no definitive guidance for interpreting the statutes at issue.

Me. Legis. Serv. Ch. 433 (West). The result of these statutory changes was to ensure that the actual amount paid to retirees would not be lowered as the result of a negative percentage change in the Consumer Price Index. Rather, in these circumstances, section 17806, as amended, called for a cost of living adjustment of zero percent.

The next round of statutory amendments in 2011 gave rise to the pending litigation. In 2011, the Maine Legislature passed multiple changes to MePERS. See P.L. 2011, ch. 380 § T (ECF No. 58-2) (herein after "the 2011 Amendments"). Two particular amendments are at issue in this case, sections T-10 and T-21. For ease of reference, the Court provides both amendments as enacted:

> **Sec. T–10. 5 MRSA § 17806, sub–§ 1, ¶ A,** as amended by PL 2009, c. 473, § 3, is further amended to read:
>
> **A.** Except as provided in paragraph A–1, whenever there is a percentage increase in the Consumer Price Index from July 1st to June 30th, the board shall automatically make an equal percentage increase in retirement benefits, beginning in September, up to a maximum annual increase of ~~4%~~ 3%. Effective July 1, 2011, the increase applies to that portion of the retirement benefit, up to $20,000, which amount must be indexed in subsequent years by the same percentage adjustments granted under this paragraph.
>
> **Sec. T–21. Cost-of-living increase to retirement benefits.** Notwithstanding any other provision of law, retirement benefits may not be adjusted to reflect any cost-of-living increase that would otherwise begin in September 2011, September 2012 or September 2013.

2011 Me. Legis. Serv. Ch. 380 (H.P. 778) (L.D. 1043) (West) (ECF No. 58-2 at Page ID#s 336 & 339). The net result of these amendments is that current beneficiaries of MePERS have not received cumulative cost-of-living adjustments for the last two years and will not receive a cumulative cost-of-living adjustment in 2013.[6] In 2014, section 17806 allows for retirees to

[6] As acknowledged by Plaintiffs, MePERS beneficiaries did receive a one-time, noncumulative COLA payment of three percent in 2012. (See Wakefield Decl. (ECF No. 63-3) ¶ 3.) Similar noncumulative cost-of-living payments may be provided in 2013 and 2014. See P.L. 2011, ch. 380 § T-22 (ECF No. 58-2 at Page ID#340).

receive a cost-of living increase. However, unlike adjustments beneficiaries may have received prior to the 2011 Amendments, any new adjustment would be three percent or less and would only apply to the first $20,000 in benefits. Given these limits, the maximum increase a retiree could receive would be $600.

## III. FACTUAL BACKGROUND[7]

In order to understand the full impact of Maine's recent changes to the method for calculating cost-of-living adjustments ("COLAs" or "COLA") due to MePERS beneficiaries, Plaintiffs provided the Court a declaration from John Wakefield, who, prior to his retirement, spent 11 years working for the Maine Legislature's Office of Fiscal and Program Review.

As noted by Wakefield, the average COLA from 1983 to 2010 was 2.85%. (Wakefield Decl. (ECF No. 63-3) ¶ 5.) The Consumer Price Index ("CPI") for the year ending on June 30, 2012 was 1.7%. (Id. ¶ 9.)

At an assumed COLA of 2.85%, a retiree with a pension benefit of $20,000 in 2012 loses $42,364 over twenty (20) years under the 2011 Amendments as compared to the pre-amendment law. At an assumed COLA of 2.85%, a retiree with a $30,000 pension in 2012 loses $111,640 over twenty (20) years under the 2011 Amendments as compared to the pre-amendment law. At an assumed COLA of 2.85%, a retiree with a $40,000 pension in 2012 loses $183,824 over twenty (20) years under the 2011 Amendments as compared to the pre-amendment law. At an assumed COLA of 2.85%, a retiree with a $50,000 pension in 2012 loses $256,607 over twenty

---

[7] Defendants' factual submission in support of the motion consists mainly of legislative history, which has been separately summarized in Part II of this Order, but no statement of material facts. In opposing Defendants' Motion, Plaintiffs submitted a statement of material facts. This submission by Plaintiffs was entirely admitted by Defendants for purposes of the pending motion. (See Defs. Reply SMF (ECF No. 74).) Thus, in this section, the Court lays out the admitted factual assertions Plaintiffs have provided in opposition to Defendants' request for summary judgment.

(20) years under the 2011 Amendments as compared to the pre-amendment law. At an assumed COLA of 4%, the range of loss for retirees with pensions between $20,000 and $50,000 in 2012 is from $111,096 to $436,923 over twenty (20) years under the 2011 Amendments as compared to the pre-amendment law. At an assumed COLA of 1% for the first five (5) years and 3% for the fifteen (15) years thereafter, the range of loss for retirees with pensions between $20,000 and $50,000 in 2012 is from $14,281 to $170,253 over twenty (20) years under the 2011 Amendments as compared to the pre-amendment law. (Id. ¶¶ 3-8.) In short, the 2011 Amendments result in each class member receiving significantly less MePERS benefits.

According to numbers provided by MePERS, the savings in "normal" pension costs realized by the COLA mandated by the 2011 Amendments for FY 2012 were $23,939,458 and $24,274,673 for FY 2013. According to numbers provided by MePERS, the 3% cap on the first $20,000 of benefits provided for in the 2011 Amendments saved the State $137,261,094 in FY 2012 and $139,756,485 in FY 2013 in reduced unfunded liability payments. (Id. ¶ 10.) In short, the 2011 Amendments result in the State of Maine having to pay significantly less into MePERS.

In FY 2012 and FY 2013, tax reductions enacted by the Legislature caused the State to lose revenue of $167,956,145. For the next biennium (FY 2014 and FY 2015) these tax reductions will cause the State to lose revenue of $530,953,050. (Id. ¶ 11.)

## IV. PROCEDURAL BACKGROUND

Recognizing the long term impact of the 2011 Amendments on the benefits to be paid to MePERS beneficiaries, the Maine Association of Retirees filed the pending complaint on February 13, 2012. Currently, Plaintiffs in this case include three organizations, the Maine

Association of Retirees, the Maine Education Association, and the Maine State Troopers Association, as well as a certified class consisting of:

> All retired State of Maine employees and public school teachers whose final termination of service occurred before June 20, 2011, and who had become eligible to receive service retirement benefits from the Maine Public Employees Retirement System no later than that date.

(Order on Motion for Class Certification (ECF No. 43) at 4.)[8] Plaintiffs press multiple claims against the Board of Trustees of the Maine Public Employees Retirement System ("the Board") and the current members of the Board. Plaintiffs' claims include (1) Violation of Contract Clause of the United States Constitution (Count I), (2) Violation of the Takings Clause of the Fifth Amendment (Count II), (3) Violation of 42 U.S.C. § 1983 (Count III). (See Am. Compl. (ECF No. 33); see also Intervenor Compl. (ECF No. 36).)[9]

After the class was certified, the parties jointly asked to stay discovery and brief two legal questions that both sides acknowledged to be potentially dispositive of Plaintiffs' claims: (1) whether the state law governing MePERS constituted a contract within the meaning of the Contract Clause; and (2) whether the 2011 Amendments impair that contract? (See Joint Objection (ECF No. 40) & Nov. 21, 2012 Report of Hearing & Order (ECF No. 45).) Having received the written and oral submissions of the parties on these issues and provided all of the necessary background, the Court turns its attention to these two questions.

---

[8] The named class representatives, Sally Morrissey, Paul Lynch, Dorothy Davis, Catherine Richard, Robert Ruhlin, Philip Gonyar and Timothy Culbert, are also Plaintiffs.

[9] The Court notes that the Intervenor Complaint (ECF No. 36) stated two additional claims under the Maine Constitution: (1) Violation of the Contract Clause found in Article I, Section 11 of the Maine Constitution (Count IV) and (2) Violation of the Takings provisions found in Article I, Section 21 of the Maine Constitution (Count V). In certifying the class, the Court ordered that the Plaintiffs file an amended complaint if these state constitutional claims were being pressed by all Plaintiffs. (See Order on Motion for Class Certification (ECF No. 43) at 3 n.1.) No amended complaint was filed. Thus, the Court deems these state constitutional claims forfeited in this case.

## V. DISCUSSION

The Constitution provides that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts." U.S. Const. art. 1, § 10, cl. 1. "Though seemingly absolute in its prohibition, the Contracts Clause 'must be accommodated to the inherent police power of the State to safeguard the vital interest of its people.'" Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 42 (1st Cir. 2005) (quoting Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410 (1983) (additional internal quotations omitted)). Generally, a court faced with a claimed violation of the Contract Clause "first ask[s] whether the change in state law has operated as a substantial impairment of a contractual relationship. This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (internal citations and quotations omitted). If even one component of this inquiry is answered in the negative, a violation of the Contract Clause cannot be established. See id. at 186-87.

When plaintiffs claim that the contractual relationship arises out of a statute, as Plaintiffs do here, the issue is decided under "federal, not state law."[10] Parella v. Retirement Bd. of R.I. Employees, 173 F.3d 46, 60 (1st Cir. 1999). The Supreme Court has stated that "[i]n general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." United States Trust Co. v. New Jersey, 431 U.S. 1, 18 n.14 (1977). It is initially presumed "that a law is not

[10] In conducting this Contract Clause analysis under federal law, the Court nonetheless recognizes that it is reviewing Maine statutes, which requires the Court to "accord respectful consideration and great weight to the views of [the Maine Law Court]." Gen. Motors Corp. v. Romein, 503 U.S. at 187 (quoting Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 100 (1938)).

intended to create private contractual or vested rights." Parella, 173 F.3d at 60 (internal quotations omitted); see also Parker v. Wakelin, 123 F.3d 1, 5 (1st Cir. 1991) (explaining that implied governmental contract obligations are disfavored and subject to the unmistakability doctrine). However, the First Circuit has indicated that this presumption may be overcome by a clear and unequivocal intent to create a contractual obligation within the statutory language. See Parella, 173 F.3d at 60 ("Statutory language, standing alone, may evince such an intent if it expressly authorizes a contract or expressly states that benefits are contractual."); see also Budge v. Town of Millinocket, 55 A.3d 484, 489 (2012) (expressing a "'reluctant[ance] to conclude that a legislative enactment creates a contractual obligation without 'language expressing an intent to create such rights.'") (quoting Spiller v. State, 627 A.2d 513, 516-17 (Me.1993)). Beyond the use of contractual language, "an unmistakable intent to contract" may be found based on language that "expressly bars future amendments that would reduce benefits already granted" or other "circumstances" that may be drawn from the legislative history. Parella, 173 F.3d at 60-61.

**A. Prior Review of Former Section 17801**

In this case, Plaintiffs assert that the 2011 Amendments substantially impair the contractual relationship between MePERS and current MePERS beneficiaries. Plaintiffs specifically assert that Maine's enactment of an "amendment not to cause reduction in benefit" demonstrates the requisite clear and unequivocal intent to contract. This amendment was initially adopted in 1975 and then revised and reallocated in 1985. See P.L. 1975, ch. 622, § 6, first codified at 5 M.R.S.A. § 1005(3) and later codified at 5 M.R.S.A. § 17801 ("Former Section 17801"). It was then repealed and replaced in 1999. See P.L. 1999, ch. 489, § 3 as codified at 5 M.R.S.A. § 17801.

The Court's review of this statute does not begin on a blank slate. Whether Former Section 17801 creates a contractual obligation was a question presented in the case of Parker v. Wakelin, 123 F.3d 1, 8 (1st Cir. 1997) ("At the heart of this case is 5 M.R.S.A. § 17801, . . . .The parties disagree as to the unmistakable intentions section 17801 represents."). Ultimately, the First Circuit refused to find that Former Section 17801 created a contractual relationship between the Parker Plaintiffs, a certified class of current Maine public school teachers, and the State of Maine. See id. at 9.

Likewise, the First Circuit held in a case involving a Contracts Clause challenge by retired Rhode Island legislators that Rhode Island legislation did not amount to a public contract. See Parella, 173 F.3d at 62. In Parella, the First Circuit explained, "[W]here a public contract allegedly arises out of statutory language, the [first] hurdle . . . —proving that a contractual relationship exists—is necessarily higher, since normally state statutory enactments do not of their own force create a contract with those whom the statute benefits." Parella, 173 F.3d at 60 (internal quotations omitted). Ultimately, the First Circuit concluded that the Parella Plaintiffs could not prove the existence of a contractual relationship and that instead the pension benefits at the center of that dispute were "ordinary, 'gratuitous' government benefits, which the legislature was free to eliminate once it became clear that these benefits threatened the tax-exempt status of the state's retirement system." Id. at 62.

Despite the unfavorable holding of Parella, Plaintiffs argue this First Circuit decision offers support for their contractual obligation claim. Specifically, Plaintiffs draw the Court's attention to the First Circuit's instruction that an express bar on "future amendments that would reduce benefits already granted" would "evince an unmistakable intent to contract." Id. at 60. This instruction is supported with a cite to the earlier First Circuit decision in Parker and a

parenthetical indicating the cite "describ[es] [an] anti-retroactivity provision in Maine pension law." Parella, 173 F.3d at 60 (citing Parker, 123 F.3d at 8-9); see also Nat'l Educ. Ass'n-R.I. v. Ret. Bd. of R.I. Employees' Ret. Sys., 172 F.3d 22, 28 (1st Cir. 1999) (containing similar citations to Parker). The Court necessarily acknowledges this parenthetical appears to refer to Former Section 17801 as an "anti-retroactivity provision." Id. However, such a description is, at best, dicta given Parker's express holding that Former Section 17801 evinced "no unmistakable intent by the Maine Legislature to create an enforceable private contract right against the modification of the plaintiffs' retirement benefits until they are actually receivable." Parker, 123 F.3d at 9. Additionally, the Parker decision further explained that the question presented by Parker did not require the First Circuit to "decide whether Contract Clause principles would apply if Maine sought to reduce pension benefits already 'due' to present retirees, a step that would in any case appear to require revision of [Former Section 17801]." Id. In short, the Court cannot declare that Former Section 17801 contains a contractual obligation based simply on the parenthetical label that may have been used to describe the provision in Parella.

Instead, the Court must acknowledge that all prior judicial review of Former Section 17801 by the federal courts and the Maine Law Court has essentially left open the question Plaintiffs squarely presented here: Does Former Section 17801 create a contractual obligation to pay cost-of-living increases to the Plaintiff Class of MePERS beneficiaries to whom benefits are currently "due"? See Parker, 123 F.3d at 9; Spiller v. State of Maine, 627 A.2d 513, 514 n. 1 (Me. 1993) ("In deciding this case, we do not address the rights of those state employees who have, pursuant to 5 M.R.S.A. § 17851 (1989 & Supp. 1992), qualified for service retirement benefits."); Soucy v. Board of Trustees of the Maine State Retirement System, 456 A.2d 1279,

1282 (1983). Before answering that question, the Court must initially consider the applicability of Former Section 17801 in light of its subsequent repeal in 1999.

**B. The Limited Applicability of Former Section 17801**

As noted in the Editor's & Revisor's Notes, the language of Former Section 17801 was "repealed and replaced" as a result of the 1999 Amendments that enacted the current version of Section 17801. This repeal must be considered in light of the longstanding mandate of Section 17853 that "the retirement system law in effect on the date of termination shall govern the member's service retirement benefit." 5 M.R.S.A. § 17853; see also Pls. Response (ECF No. 63) at 12 ("[I]n straightforward language, the statute sets the final date of a MePERS member's employment as the benchmark for calculating her retirement benefits.") In light of the clear language of Section 17853, the Court readily concludes that any class member who retired after October 1, 1999 is entitled only to the "solemn contractual commitments" contained in the current version of Section 17801.

These post-Parker amendments to Section 17801 make it unmistakably clear that the Maine Legislature would make solemn contractual commitments to members and beneficiaries as to some aspects of Maine retirement benefits, as specifically listed in 5 M.R.S.A. § 17801(1)(B)(1).[11] Among the solemn contractual promises listed in that section was a promise that no beneficiary would have to wait more than 12 months to be eligible for a cost-of-living adjustment. See id. § 17801(1)(B)(1)(b). All of the other cost-of-living promises contained in the subsections (1) through (3) of Section 17806 are noticeably absent from the explicit list of

[11] At oral argument, counsel for Defendants in fact conceded, "It would be difficult to imagine language that is more clearly contractual as the language that was included in the 1999 Amendments." (5/14/2013 Oral Argument Transcript at 11.)

solemn contractual commitments adopted by the Maine Legislature in 1999 as part of the express response to the First Circuit's Parker decision. See *supra* II (discussing legislative history). As a result, these cost-of-living adjustments "may be increased, decreased, otherwise changed or eliminated by the Legislature as to any member regardless of whether the member has or has not met any creditable service requirement for eligibility to receive a service retirement benefit." 5 M.R.S.A. § 17801(2). To the extent Plaintiffs have argued that the current version of Section 17801 applies solely to members and has no application to beneficiaries, the Court finds this argument to be without merit and in direct contradiction to the clear language of Section 17853. (See Pls. Response (ECF No. 63) at 16-17; see also *infra* note 17 (rebutting a similar argument made by Defendants).)

In short, even assuming that Former Section 17801 can be read to set a contractual "floor" on the benefits due to retirees, as argued by Plaintiffs, the Court concludes this "floor" has no application to a member who retired after its repeal.[12] Thus, the Court is left to consider whether Former Section 17801 creates a contractual obligation to any beneficiary who retired prior to October 1, 1999.[13]

[12] As Defendants noted at oral argument and in their brief, the 1999 Amendment to Section 17801 in all likelihood would require the Court to split the class between those who retired before October 1, 1999 and those who retired after that date. (See Defs. Mot. (ECF No. 58) at 22 n.22; Defs. Reply (ECF No. 76) at 3 n.4.) The Court notes that despite Defendants' recent suggestions that the class may not present a common question, Defendants have never opposed certification of the class under the current broad definition. Ultimately, because the Court finds that no portion of the previously certified class is entitled to relief on the claims presented, the Court need not consider sua sponte decertifying the class or otherwise amending its Order on Motion for Class Certification (ECF No. 43).

[13] The Court notes that at least some of the class representatives are MePERS beneficiaries who retired prior to October 1, 1999. (See, e.g., Am. Compl. ¶¶ 3 & 5; Backstrom Decl. (ECF No. 7); Culbert Decl. (ECF No. 8); Gonyar Decl. (ECF No. 9).)

**C. Does Former Section 17801 create a contractual obligation to pay COLAs to any MePERS beneficiaries?**

Plaintiffs maintain that Former Section 17801 contains an unequivocal "express bar[ ]" on "future amendments that would reduce benefits already granted." Parella, 173 F.3d at 60-61. As a result of this "no amendment" language and the "circumstances" detailed in MePERS long legislative history, Plaintiffs see an unmistakable contractual relationship. Id.[14] Under Plaintiffs' view, this relationship between retirees and the State was substantially impaired when the State enacted amendments that changed the method for determining COLAs.

Ultimately, having conducted a full review of the legislation and the related legislative history, the Court does not find that the 2011 Amendments operated as a substantial impairment of any contract created by Former Section 17801. In other words, assuming without deciding that Former Section 17801 can be deemed to have created some clear and unequivocal contractual obligation to those retirees to whom it applies pursuant to Section 17853, the Court concludes that any contractual obligation does not include the annual COLAs legislatively mandated prior to the 2011 Amendments. The Court reaches this conclusion as a matter of statutory construction recognizing that the Law Court has endorsed a "holistic" view of statutory construction, particularly with respect to the Maine State Retirement System. See McPhee v. Maine State Ret. Sys., 980 A.2d 1257, 1265 (Me. 2009) ("Statutory construction is a holistic process: we construe the whole statutory scheme of which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved.") (internal quotations omitted); see also Michalowski v. Bd. of Licensure in Med., 58 A.3d 1074, 1078 (Me. 2012) (explaining a "three-part analysis" for statutory construction) & Spiller, 627 A.2d at 515.

---

[14] Juxtaposing the language of Former Section 17801 and the current Section 17801, it is apparent that Former Section 17801 lacks clear contract-type language. Thus, this particular avenue is not actually available to Plaintiffs.

First, the Court considers what Former Section 17801's reference to "any reduction in the amount . . . due" means. As the First Circuit noted in its prior consideration of Section 17801, "'due' could easily be read to mean currently payable." Parker, 123 F.3d at 8. Under this definition, no COLA is *due* until September of the year in which the amount of the adjustment is actually made.[15] Additionally, the 2011 Amendments did not actually *reduce* the dollar amount of benefits received by any class member. Rather, the only allegation is that the dollar amount paid was not increased in accordance with the Consumer Price Index. As noted by Defendants, withholding an increase is not within the standard dictionary definition of "reduction." (See Def. Mot. (ECF No. 58) at 19-20 & n.19.) See also, e.g., State v. Spaulding, 707 A.2d 378, 379-80 (Me. 1998) (endorsing the use dictionary definitions to assist in statutory construction). In short, nothing in the record reflects that the 2011 Amendments have caused "any reduction" in the amount "due" pursuant to the plain meaning of those terms as they appear in Former Section 17801.

The Court notes that the recent legislative history offers some additional support for adopting the plain meaning of "reduction" and "due" in interpreting the reach of Former Section 17801. In 2009, the Consumer Price Index was reporting an annual decrease for the period from July 1st to June 30th.[16] Under the then-existing terms of Section 17806, this decrease would have resulted in automatic decrease to the retirement benefits to be paid to all beneficiaries starting in September 2009. However, the Maine Legislature passed *An Act to Provide Continued Protection of Benefits for Retirees of the Maine Public Employees Retirement System* on an emergency basis on June 17, 2009. See 2009 Me. Legis. Serv. Ch. 433 (West). This

[15] In fact, a new retiree is not eligible and "due" a cost-of living adjustment until he completes the initial waiting period as detailed in 5 M.R.S.A. § 17806(3).

[16] See CPI Detailed Report Data for June 2009 available at http://www.bls.gov/cpi/#tables (last visited 6/21/2013).

emergency amendment to Section 17806 ensured that a decrease in the Consumer Price Index would result in the Board setting the COLA at zero percent, resulting in no actual reduction of the amount of benefit then due to MePERS beneficiaries. See id. In short, under the plain meaning of "reduction" and "due," the Court cannot say that the failure to provide a COLA increase in any given future year violates Former Section 17801.

Second, it is not clear and unmistakable that a "cost-of living adjustment" falls under the umbrella of "benefits . . . due to a member based on creditable service, earnable compensation, employee contributions, pick-up contributions and the [other provisions of the Maine Retirement System]." See Former Section 17801. Notably, "cost-of-living adjustments" was not included in the "based on" list of benefits that are explicitly protected from reduction under Former Section 17801. Additionally, under the applicable Maine statutes, "benefit" is generally defined as "any payment made, or required to be made, to a beneficiary" under the benefits provisions of the state retirement system, 5 M.R.S.A. §§ 17801-18007. A plain reading of this "benefit" definition could reasonably exclude annual upward adjustments that are yet to be determined and may range from anywhere from zero percent up to four percent. Given the potential for variations in the payment to be made, the Court cannot conclude that Former Section 17801 included not-yet-determined COLAs under the umbrella of "benefits" that could not be reduced.[17]

[17] Defendants have alternatively argued that Former Section 17801 has no application to the Plaintiff Class because they are not technically "members" as that term is used in Section 17801. The Court finds this particular argument unpersuasive. Given Parker's holding that Former Section 17801 had no application to "members" who were not yet "due" any benefits, Defendants' suggestion that the statute now be read to strictly define "members" in accordance with 5 M.R.S.A. §§ 17001(20) & 17654 and thereby exclude the entirety of this Plaintiff Class of MePERS beneficiaries would yield a nonsensical result. The Court notes that throughout Subchapter 5, which contains the MePERS benefits provisions and the key statutes at issue here, the statutes refer to "member" when it is apparent that "beneficiary" technically would have been the more appropriate term. See, e.g., 5 M.R.S.A. § 17804 ("A full month's benefit shall be paid to the beneficiary or estate of the recipient for the month in which the *member* dies."); 5 M.R.S.A. § 17853 ("*member*'s service retirement benefit").

Lastly, the Court notes that Plaintiffs' proposed reading of Former Section 17801 to include every cost-of-living increase that may be awarded in the future has the effect of rendering Section 17806(1)(C) is meaningless. This subsection of the COLA statute, which was part of its initial 1985 enactment, reads:

> Notwithstanding any other provision of this section, the amount of annual retirement benefit otherwise payable under this Part may not be less than the retired member received on the effective date of his retirement or on July 1, 1977, whichever amount is greater.

5 M.R.S.A. § 17806(1)(C). Thus, it appears that this subsection of Section 17806 sets its own clear floor below which benefits cannot be reduced as a result of COLAs. The Court cannot say clearly and unequivocally that Former Section 17801 can be read to create a contractual obligation to an even higher floor and thereby render this portion of the statutory language meaningless.[18] See, e.g., Dyer v. Maine Drilling & Blasting, Inc., 984 A.2d 210, 223-24 (Me. 2009) ("Our rules of statutory construction direct that, when possible, we should not construe statutes . . . to render statutory language surplusage or meaningless.") & Cent. Maine Power Co. v. Devereux Marine, Inc., 2013 ME 37, -- A.3d --- (Me. 2013) (noting "the fundamental rule of statutory construction that . . . favor[s] the application of a specific statutory provision over the application of a more general provision when there is any inconsistency").

For all of these reasons, the Court finds that there is no contractual right to COLAs based on Former Section 17801 and alternatively finds that the 2011 Amendments do not substantially impair any contractual obligations that might be found in Former Section 17801 and Section 17853. See, e.g., Kittery Retail Ventures, LLC v. Town of Kittery, 856 A.2d 1183, 1196 (Me. 1994) ("Substantial impairment does not occur when a change in law does not affect the express

[18] The Court does acknowledge that the 2009 emergency amendments to Section 17806 have essentially rendered the language of Section 17806(1)(C) unnecessary since there is no longer a possibility that a COLA would decrease the annual retirement benefit to less than the retired member received on the effective date of his retirement. See 2009 Me. Legis. Serv. Ch. 433 (West), codified at 5 M.R.S.A. § 17806.

terms of the contract or the obligations of the parties, but only affects the underlying subject matter of the contract.") Having reached this conclusion, the Court "need not decide whether the statute ever gives rise to a contractual relationship." Parker, 123 F.3d at 9.

## VI. CONCLUSION

Thus, the Court concludes as a matter of law that Plaintiffs cannot prove that the Maine Legislature unmistakably intended to contractually obligate the State to provide COLAs to any member of Plaintiff Class under the formula in place prior to the 2011 Amendments. Having failed to meet this admittedly high bar, this Court cannot pronounce pre-2011 COLA enactments binding on all future Maine Legislatures. "'Although one may conclude that it was unnecessary or even unwise for the legislature to have [made the statutory changes at issue], it is not for this court to substitute its opinion on the merits or desirability of the legislation for that of the legislature.'" Budge v. Town of Millinocket, 55 A.3d 484, 490 (2012) (quoting Spiller, 627 A.2d at 517).

For the reasons just discussed, the Court GRANTS Defendants' Motion to Dismiss and for Summary Judgment (ECF No. 58). As a result, the Court hereby ORDERS that final judgment enter on behalf of Defendants on all claims.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 24th day of June, 2013.